UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | |
|---|---|
| KEITH HEMM, | : Case No. 3:16-cv-00123 |
| Plaintiff, | : |
| vs. | : Magistrate Judge Sharon L. Ovington |
| | : (by full consent of the parties) |
| NANCY A. BERRYHILL, COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : |
| Defendant. | : |

# DECISION AND ENTRY

## I.

Plaintiff Keith Hemm suffered a painful back injury accompanied by groin pain while working on January 9, 2013. After receiving treatment, he unsuccessfully attempted to work a modified job for the same employer. He has not worked since then due, in part, to ongoing back pain. Medical testing revealed "mild degenerative disc disease" in his lower lumbar spine and mild disc bulge at L4-L5 and a disc bulge at L5-S1. (Doc. #6, *PageID* #420). Plaintiff concluded that these and other health problems constituted one or more disabilities, making him eligible to receive Disability Insurance Benefits from the Social Security Administration. He therefore filed an application for such benefits asserting that his disabilities began on January 9, 2013.

The Social Security Administration—through the decision of Administrative Law Judge (ALJ) Theodore W. Grippo—determined that Plaintiff was not under a disability and, consequently, was not eligible to receive Disability Insurance Benefits.

Plaintiff brings the present case challenging ALJ Grippo's non-disability decision on the ground that he erred by rejecting the medical opinions of Family Nurse Practitioner–Certified (FNP-C) Alissa McDivitt, FNP-C, and certified nurse practitioner (CNP) Karmen Arnett. Plaintiff raises additional challenges based on the ALJ's (1) failure to prove there are a significant number of jobs available for someone with Plaintiff's limitations; (2) improper evaluation of Plaintiff's credibility; and, (3) failure to fulfill his duty to fully develop the record. Plaintiff seeks an order remanding this matter to the Social Security Administration for payment of benefits or for further proceedings.

The Commissioner finds no error in the ALJ's decision and contends that substantial evidence supports the ALJ's findings. The Commissioner therefore asks the Court to affirm the ALJ's non-disability decision.

## II.

On the date Plaintiff's asserted disabilities began, he was 43 years old. He was therefore considered a younger person under Social Security law. He had a high school education and worked in the past as a warehouse manager.

Before issuing his decision, ALJ Grippo held a hearing during which Plaintiff was represented by an attorney. Plaintiff testified that he stopped working on January 9, 2013 after he "had a pop" in his back that caused pain into his groin. (Doc. #6,

*PageID* #76). He explained that he has degenerative spondylitis that causes him a great deal of pain and requires him "to sit, to stand, to lie down throughout the day and periods of 20 minutes to a half hour increments, probably." *Id*. at 77. The pain is in his lower back extends mainly into his left leg, although he was starting to feel pain in both legs. After sitting for 20 minutes, his pain increases and is "pretty intense." *Id*. It forces him to get into another position. He lies down at least 4 times during an 8-hour day. He stays lying down for 20 to 25 minutes at a time.

Plaintiff's testified that his treatment has included 4 epidural injections. Although the first injection helped relieve his pain for 4 to 5 days, he obtained no pain relief from the other injections. He explained, "The treatment right now is trying to just do these injections, and that's basically to just give me relief of pain. It's doing nothing to fix any of the degeneration in my back or my discs." *Id*. at 85.

Plaintiff further explained that it is "very, very difficult" for him to bend. *Id*. at 80. He has problems lifting his arms above his shoulders—it increases his back "pain tremendously." *Id*. He is limited to lifting 5 pounds. Lifting more would probably cause further injury to his back. *Id*. at 85.

After Plaintiff injured his back on January 9, 2013, he went to the Reid Hospital. He was diagnosed with low back pain with radiculopathy and testicular pain. *Id*. at 363. He was discharged the same day with medication and follow-up instructions.

An MRI in late January 2013 disclosed that Plaintiff has "mild degenerative disc disease" in his lower lumbar spine and has "mild disc bulge and facet hypertrophy

at L4-L5." *Id*. at 420. The MRI also revealed "facet hypertrophy and disc bulge at L5-S1." *Id*. When Plaintiff returned to Reid Hospital for his follow up, he reported continuing bilateral back pain that radiated into his left leg. A physical examination by Jennifer Bales, MD, produced "a full range of motion of the extremities without tenderness to palpation." *Id*. at 364. Dr. Bales reviewed the MRI and concluded it showed "no significant abnormalities. There is a mild disc protrusion, but nothing significant, and there [are] some mild degenerative changes. No bony abnormalities." *Id*. Dr. Bales discontinued Plaintiff's pain medication, noting that treatment with ibuprofen is reasonable. She referred him to physical therapy. *Id*.

Plaintiff saw Nurse McDivitt for physical therapy. She examined Plaintiff and reported that he appeared to have "more paraspinal tenderness in the bilateral lumbosacral region." *Id*. at 361. Palpation of his left sacroiliac regions revealed it was "just very tender, sensitive to the touch, and almost caused him some vomiting." *Id*. He reported that he was nauseated and in a lot of pain. Bilateral-straight-leg testing produced "some discomfort in his lower back…, but it was essentially a negative test." *Id*.

On February 6, 2013, Nurse McDivitt discharged Plaintiff from physical therapy with instructions that he do no lifting over 5 pounds and no "bending, twisting, turning, or driving in the company car. No overhead or below-the-waist work. He may work in a sitting position or upright. Avoid twisting, bending, stooping, or squatting with frequent breaks, and break up his change in position." *Id*. She

prescribed prescription pain medication that would last about 2 weeks. She also prescribed heat therapy every 2 to 3 hours for 48 hours, as needed.

Ravishankar Vedantam, MD, saw Plaintiff in consultation in February 2013. After this consultation, Plaintiff followed up with Dr. Vedantam several times. *Id*. at 429-34. In March and April 2013, Dr. Vedantam reported that Plaintiff may return to work, *id*. at 410, 413, with the following limitations: No ladders and scaffolds; no jumping or running; no lifting over 15 pounds; no repetitive movements of his lumbar spine; no pivoting; no twisting and bending of his lumbar spine. *Id*. at 411, 413. Dr. Vedantam further believed that Plaintiff could engage in squatting, sedentary work, prolonged standing, and other activities as tolerated. *Id*.

On June 4, 2013, Albert G. Singh, MD, treated Plaintiff with bilateral L4-L5 and L5-S1 facet joint injections. *Id*. at 374. Two weeks later, Plaintiff reported to Dr. Singh that he had 20-30% improvement in his pain after the injections. Still, he continued to have low-back pain but did not report radicular symptoms in his legs. *Id*. at 436. On examination, Plaintiff was significantly tender over the sacroiliac joints bilaterally. He had positive FABER, Patrick's, and Gaenslen's bilaterally. *Id*. Plaintiff told Dr. Singh that prolonged sitting exacerbated his low-back pain. *Id*. at 435. Dr. Singh diagnosed Plaintiff with spinal stenosis of the lumbar region, lumbosacral spondylosis, lumbar region sprain, and lumbago. *Id*. at 436.

In January 2014, Plaintiff went to the Wayne Hospital emergency department due to 2 days of exacerbated back pain. He told them that he had muscle spasms and that movement worsened his back pain, which was relieved by nothing. *Id*. at 443.

Upon examination, Plaintiff exhibited decreased range of motion, muscle spasm, and vertebral point-tenderness of the lumbar spine. *Id*. at 444. He was diagnosed with acute, chronic low-back pain.

On January 24, 2014, Nurse Arnett completed a medical source statement regarding Plaintiff's work abilities and limits. *Id*. at 423-24. Nurse Arnett opined that Plaintiff could frequently lift and carry a maximum of less than 10 pounds. She also believed that Plaintiff cannot stand or walk for even 2 hours in an 8-hour workday due to his severe medical impairments and cannot even sit for 2 hours in an 8-hour workday due to his severe medical impairments. She additionally concluded that Plaintiff could only occasionally bend and could never twist, crouch, or climb stairs or ladders due to his degenerative disc disease.

**III.**

Plaintiff's eligibility for Disability Insurance Benefits benefits turned on whether he was under a "disability" as the Social Security Act narrowly defines it. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see* 42 U.S.C. § 423(a)(1)(E). An individual's health problems constitute social-security-eligible disabilities only when their physical or mental impairments are of such severity that they (1) cannot do their previous work, and (2) cannot, "considering their age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy …." 42 U.S.C. § 423(d)(2)(A).

As indicated previously, it fell to ALJ Grippo to evaluate the evidence and determine whether Plaintiff was under a disability. He did so by considering each of

6

the five well-known sequential steps described by the regulations. *See* 20 C.F.R. § 404.1520(a)(4); *see also Rabbers*, 582 F.3d at 652.

Moving through some initial findings, the ALJ reached steps 2 and 3 where he found that Plaintiff's severe impairments—"degenerative disc disease, and gastroesophagitis with focal area of ulceration"—did not automatically constitute disabilities. (Doc. #6, *PageID* #50). At step 4, the ALJ assessed Plaintiff's work abilities as follows:[1]

> [Plaintiff] has the residual functional capacity to perform light work … except [he] can occasionally climb ladders, ropes and scaffolds, and occasionally climb ramps and stairs. [He] is able to frequently balance, kneel, and crouch. [He] can occasionally stoop and crawl.

*Id*. at 50.

Plaintiff's limited abilities, according to ALJ Grippo, prevented him from being able to perform his past work as a warehouse manager but did not prevent him from performing a significant number of available jobs, such as small products assembler, labeler/marker, and desk clerk. *Id*. at 56-57. This meant he was not under a disability and not entitled to benefits. *Id*.

The present review of ALJ Grippo's decision determines whether he applied the correct legal standards and whether substantial evidence supports his findings. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of*

---

[1] The Social Security Administration refers to what a person can do as his or her "residual functional capacity." *See* 20 C.F.R. § 404.1545(a); *see also Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002).

7

*Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). If he failed to apply the correct legal criteria, his decision may be fatally flawed even if the record contains substantial evidence supporting his findings. *Rabbers*, 582 F.3d at 651; *see Bowen*, 478 F.3d at 746; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004). Substantial evidence supports a finding when "a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance ...." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

## IV.

Plaintiff argues that the ALJ completely failed to evaluate Nurse McDivitt's and Nurse Arnett's opinions by not weighing their opinions under the regulatory factors applicable to acceptable medical sources' opinions. The regulatory factors include, in part, the length of the treatment relationship, frequency of examination, supportability, consistency, and specialization. 20 C.F.R. §§ 404.1527(c)(2)-(5).

The Commissioner contends that the ALJ reasonably placed little weight on Nurse McDivitt's and Nurse Arnett's opinion because their status as non-acceptable medical sources means that their opinions can never be given controlling or deferential weight.

Nurse McDivitt's status as Plaintiff's physical therapist and a Family Nurse Practitioner–Certified and Nurse Arnett's status as a Certified Nurse Practitioner place them on the category of "other sources" as opposed to "acceptable medical sources."

8

*See* 20 C.F.R. §§ 404.1513(a), (d). Still, the ALJ was required to consider their opinions. *See* Soc. Sec. Ruling 06-3p, 2006 WL 2329939, at *1 (Aug. 9, 2009) (citing 20 C.F.R. §§ 404.1512, 404.1527) (other citation omitted). The Commissioner, through Ruling 06-03p, explains:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

2006 WL 2329939, at *3. The factors applicable to acceptable medical sources "can be applied to opinion evidence from 'other sources.'" *Id.* at *4. ALJs "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6.

As ALJ Grippo properly recognized, accepting either Nurse McDivitt's or Nurse Arnett's opinions about Plaintiff's work limitations would mean he could do less than the sedentary range of work. *See* Doc. #6, *PageID* #s 55, 361, 423-24. But, the ALJ placed no weight on their opinions and, instead (as noted above), found that Plaintiff could perform a limited range of light work. *Id.* at 50, 55. He rejected these Nurses' opinions in part because they are not acceptable medical sources. *Id.* at 55.

9

An ALJ's rejection of a nurse practitioner's opinion on the single ground that he or she is not acceptable medical source is a questionable practice, particularly when a non-acceptable medical source's opinions may, in certain circumstances, outweigh a treating source's opinions.  *See* Soc. Sec. R. 06-03p, 2006 WL 2329939, at *5; *see also Cruse v. Comm'r of Soc. Sec*., 502 F.3d 532, 541 (6th Cir. 2007) ("the ALJ should have discussed the factors relating to his treatment of nurse practitioner Hasselle's assessment, so as to provide some basis for why he rejected the opinion.").  Yet, in the present case, the ALJ properly considered Nurse McDivitt's and Nurse Arnett's status as non-acceptable medical sources as one among other reasons for rejecting their opinions.

The ALJ rejected Nurse McDivitt's opinions because she gave them when Plaintiff was discharged from Reid Hospital in February 2013 and her opinions "appear to be temporary and precautionary in nature." (Doc. #6, *PageID* #55).  These are valid reasons for rejecting Nurse McDivitt's opinions, which appear in discharge instructions she provided Plaintiff.  Nothing in these instructions indicates that she believed Plaintiff's limitations would last longer than 12 months or were permanent. *Id*.  Her instructions, moreover, can be reasonably read as precautionary because the limitations directly correlate with the goal of minimizing Plaintiff's back pain or aggravating his back injury.  This is seen, for example, in her instruction "to do no lifting over 5 pounds; bending, twisting, or turning; or driving the company car." *Id*. at 361.  Plaintiff, moreover, had only seen Nurse McDivitt twice at the time she

discharged him from physical therapy. (Doc. #6, *PageID* #s 360-61). As a result, she did not have a long-term or frequent treatment relationship with him.

The ALJ's evaluation of Nurse Arnett's opinions is less than precise and less than what a well-reasoned decision should contain. The ALJ rejected Nurse Arnett's opinions because her statement is "incomplete and she answered 'unknown' to several questions." *Id*. Nurse Arnett completed the form by answering each question. *Id*. at 423-24. Although she answered "unknown" to 2 questions (not several questions), this does not mean she failed to complete the form. And, her acknowledgment that she did not know the answers to 2 questions tends to show genuineness and honesty rather than exaggeration or bias in Plaintiff's favor. These problems with the ALJ's reasoning are not fatal to his decision because they are *de minimis* errors in light of the obvious shortcomings Nurse Arnett's opinions contain.

Other than citing Plaintiff's diagnoses, Nurse Arnett did not provide any clinical findings or diagnostic test results that support the limitations she thought Plaintiff had. *See id*. at 423-24. A diagnosis alone sheds no light on the severity of an impairment or whether it constitutes a disability. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988); *see also Carpenter v. Comm'r of Soc. Sec.*, No. 3:16 CV 720, 2017 WL 1038913, at *11 (N.D. Ohio Mar. 17, 2017) ("[D]iagnosis of a condition alone does not necessarily make the condition severe."). Nurse Arnett provided no meaningful explanation in support of her opinions. She merely circled responses and listed diagnoses, but did not explain why, for example, Plaintiff could only stand 5 minutes at a time, as opposed to 20 or 30 or 60 minutes. (Doc. #6, *PageID* #s 423-

11

424). These were prominent omissions. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."). Similarly, Nurse Arnett checked boxes indicating that Plaintiff would have limitations in fingering, handling, and feeling, but she did not provide any explanations or reference to supporting medical evidence for these restrictions. At least some explanation was needed given the lack of evidence that Plaintiff ever reported an issue with his hands. And, conclusory restrictions such as these carry little significance for social security purposes. *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("[T]he ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.") (internal quotation marks omitted).

Steering in a different direction, Plaintiff argues that the ALJ failed to satisfy his duty to fully and fairly develop the record because he did not obtain medical records from the Preble County Medical Center, where Plaintiff saw Nurse Arnett for treatment. Plaintiff also points out that the ALJ requested a copy of his workers compensation filed.

ALJs have a statutory duty "to fully develop the record." *Lashley v. Sec'y of HHS*, 708 F.2d 1048, 1051 (6th Cir. 1983). This duty exists regardless of whether the claimant is represented by counsel or proceeds pro se. *See Gibson v. Comm'r of Soc. Sec.*, No. 1:13cv069, 2014 WL 619135 at *5 (S.D. Ohio 2014) (Litkovitz, MJ) (and

cases cited therein), Report and Recommendations adopted, 2014 WL 1096132 (S.D. Ohio 2014) (Dlott, CJ).

The ALJ did not fail to satisfy his duty in the present case. In response to Plaintiff's counsel's request, the ALJ granted him 30 days to obtain and submit Plaintiff's records from the Preble County Medical Center and his workers compensation file. *(*Doc. #6, *PageID* #s 66, 86). Plaintiff does not point out, and there is no indication in the record, that his counsel sought an extension of the 30-day deadline or otherwise informed the ALJ that he was having trouble obtaining the records and, therefore, needed a subpoena. In these circumstances, it was reasonable for the ALJ to believe that Plaintiff's counsel would submit the records on time or seek a subpoena. As a result, the ALJ did not violate his duty to compile a full and fair record.

Accordingly, Plaintiff's challenges to the ALJ's review of Nurse McDivitt's and Nurse Arnett's opinions, and his challenges to the ALJ's compilation of the record, lack merit.

## V.

Plaintiff argues that the ALJ improperly evaluated Plaintiff's credibility by relying on his unsuccessful work attempt after his disability onset date. He asserts that his attempt to work despite his back pain supports his credibility. He also contends that his reports of pain should have been given great weight as he has continuously searched for pain relief.

13

"In evaluating complaints of pain, an ALJ may properly consider the credibility of the claimant." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (citation omitted). An ALJ's credibility findings "are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Id*. (citations omitted).

The ALJ discussed Plaintiff's testimony regarding the frequency and intensity of his symptoms, his medications and side effects, and his treatment history. Substantial evidence supports his findings. The ALJ reasonably observed that Plaintiff "has not generally received the type of medical treatment one would expect for a disabled individual." (Doc. #6, *PageID* #52). Just weeks after his injury, the doctor would not prescribe pain medication and instead told him to take over-the-counter Ibuprofen. *Id*. at 364. In February 6 2013, Nurse McDivitt noted that Plaintiff reported "he was riding in a truck this past week, getting in and out of the truck like 40 times, which I do believe is an aggravating factor." *Id*. at 360. This amount of activity tends to support the ALJ's credibility conclusion. In addition, Ibuprofen and hot showers helped to relieve his pain, *id*., a further indication that Plaintiff was not in significantly debilitating pain. In April 2013, Dr. Vedantam wrote that Plaintiff "may continue with nonoperative modalities of treatment" and should engage in "activity modification, taking over-the-counter anti-inflammatory and analgesic medications, range of motion exercises for the lumbar spine and use … the lumbar belt when doing any physical work," and "he may also use … a heating pad as needed." *Id*. at 410.

Treatment notes in March 2014 state, "TENS [unit] is effective in reducing pain." *Id*. at 476. In August 2014, Scott West, DO, reported that Plaintiff "should continue with conservative care and pain management." *Id*. at 54-55, 490.

The substantial evidence supporting the ALJ's credibility conclusion also consists of records showing that just 20 days after his work injury a physician noted that he was able to "move about the room easily without difficulty," and he had "full range of motion of the extremities without tenderness to palpation." *Id*. at 364. This physician further reported, "Review of the MRI the reveals no significant abnormalities. There is a mild disk protrusion, but nothing significant, and there [are] some mild degenerative changes." *Id*. at 364 (referring to MRI, *id*. at 391). The next month, his lower extremity strength was 5/5 bilaterally, reflexes were normal, he had an "essentially negative" straight leg raise test, no pain going down the leg, and "[o]therwise, he ha[d] full range of motion of his extremities without tenderness." *Id*. at 361. By September 2013, Plaintiff was not in distress, had a normal gait, normal coordination, and normal reflexes, negative straight-leg-raise and Faber tests bilaterally, normal strength and tone, full range of motion, and no focal neurologic deficit. *Id*. at 469. In August 2014, Dr. West noted that Plaintiff's MRI failed "to demonstrate any significant disc herniations. He did have some left facet joint hypertrophy but this was only causing minimal foraminal stenosis at the LS-S1 level on the left." *Id*. at 490.

Accordingly, substantial evidence supports the ALJ's credibility findings.

# VI.

Plaintiff contends that the ALJ failed to prove that there are a sufficient number of jobs available in the national economy for an employee with his residual functional capacity.

The ALJ adopted the vocational expert's testimony at step 5 of his sequential analysis and found that a person with Plaintiff's residual functional capacity, age, education, and work experience could work as a small parts assembler, a label/marker, and a desk clerk. The vocational expert testified that he used the <u>Dictionary of Occupational Titles</u> (the DOT) to classify these jobs. *Id*. at 94. And, the ALJ recognized, based on the vocational expert's testimony, that a significant number of such jobs exist nationally, specifically: 175,000 small parts assembler jobs; 210,000 label/marker jobs; and, 229,000 desk clerk jobs. *Id*. at 56-57. These findings led the ALJ to conclude that a significant number of jobs exist in the national economy that Plaintiff can perform. *Id*.

To the extent the vocational expert was asked about limitations the DOT does not address (need to change positions, absenteeism, etc.), the vocational expert explained that he based his answers "on over 35 years of experience as a certified rehabilitation counselor and … [his] experience in counselor education and rehabilitation counselors over 27 years." *Id*. at 95-96.

In addition, the following brief colloquy occurred during counsel's questioning:

> Q. Okay. Prior to the hearing did you prepare any list of sedentary, light and medium jobs to pick from based upon hypotheticals?

> A. [vocational expert] I have references based on studying job data from the Bureau of Labor Statistics, that's correct.

*Id.* at 91.

Plaintiff contends that the vocational expert did not meaningfully explain his methodology. Meaningful explanation was needed here, according to Plaintiff, because the vocational expert relied on job data from the Bureau of Labor Statistics, which no longer uses the DOT. Counsel, however, did not ask the vocational expert to explain his methodology or his reliance on job data from the Bureau of Labor Statistics. The ALJ was not required to do so *sua sponte*. *Cf. Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir. 2008) ("nothing in applicable Social Security regulations requires the administrative law judge to conduct his or her own investigation into the testimony of a vocational expert to determine its accuracy….") (citing *Martin v. Comm'r of Soc. Sec.,* 170 F. App'x 369, 374-75 (6th Cir. 2006)).

There was, however, discussion between counsel and the ALJ at the start of the hearing about the vocational expert and the DOT.[2] During this discussion, counsel did not object to the vocational expert's qualifications; he instead argued that the ALJ should discard the DOT "because it is so outdated" and reliance on it would constitute error. *Id.* at 69. The ALJ countered that the regulations obliged him to refer to the DOT and that he had no authority to discard it. *Id.* at 69-70. Counsel acknowledged

---

[2] Counsel also raised the issue in a post-hearing brief. *Id.*

that he understood this and expressed his belief that "this would be an issue for appeal." *Id*. at 70. And here we are.

The Social Security Administration takes administrative notice of the information provided by various governmental sources, including the DOT and other publications. 20 C.F.R. § 404.1566(d). Because of this, the ALJ did not err by accepting the vocational expert's testimony about the DOT's job classifications. *See id*. Additionally, "while the ALJ may take judicial notice of the classification in the [DOT], the ALJ may accept testimony of a vocational expert that is different from information in the [DOT]." *Conn v. Sec'y of HHS*, 51 F.3d 607, 610 (6th Cir. 1995). The vocational expert in this case confirmed that his testimony was consistent with the DOT's classifications. He also explained that the jobs he identified did not require work abilities above the limitations in the ALJ's hypotheticals. (Doc. #6, *PageID* #95). The vocational expert further stated that if a job he identified was performed at a different level than the DOT describes, he would inform the ALJ. And, to the extent the DOT did not address certain job limitations a person might have, the vocational expert based his testimony on his many years of experience. *Id*. at 95-96. Given these reassurances by the vocational expert, the ALJ did not err in relying on the job classifications the vocational expert identified.

This leads to Plaintiff's main line of thinking. The DOT classifies and defines jobs. It does not say how many of each (or any) job is available in the national economy. The vocational expert connected the DOT's job descriptions with the number of such available jobs as reported by the Bureau of Labor Statistics–even

18

though the Bureau no longer uses the DOT. Plaintiff maintains that there is currently no government data regarding the number of jobs available in the national economy based on the DOT codes. In other words, Plaintiff says, "Just because there is a job title in the DOT does not mean that there are a significant number of those jobs available in the national economy." (Doc. #10, *PageID* #551).

Plaintiff's contentions might well win the day if social security law required ALJs to reject the DOT or explore the validity of the vocational expert's testimony under a *Daubert*-like[3] analysis. But a *Daubert*-like analysis is not required in social security cases. *Brault v. Comm'r of Soc. Sec.*, 683 F.3d 443, 451 n.2 (7th Cir. 2012). This borders on self-evident because social security hearings "are inquisitorial rather than adversarial," *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000), and because the Federal Rules of Evidence do not apply during these administrative hearings. S*chuler v. Comm'r of Soc. Sec.*, 109 F. App'x 97, 102 (6th Cir. 2004) (citing *Cline v. Secretary of Health,* 444 F.2d 289, 291 (6th Cir.1971)). And when, as here, the ALJ did not err in accepting the DOT job classifications and the vocational expert relied on his own vast vocational-work experience to consider the differences between the DOT classifications and the ALJ's hypotheticals, it was reasonable for the ALJ to accept the vocational expert's job numbers without probing his method of matching the job classifications he adopted with the Bureau of Labor Statistic's job numbers. *See*

---

[3] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

*Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009) ("Perhaps ideally the VE [vocational expert] would have been able to say a bit more, but this does not go without saying. The witness was testifying as a vocational expert, not as a census taker or statistician. Indeed, even if the VE had happened to know something about the statistical basis for her testimony, she arguably still would not be in a position to fully vindicate her conclusions."); *cf. Taylor v. Comm'r of Soc. Sec.*, __F. App'x__, 2017 WL 2927483, at *8 (W.D. Mich. 2017) ("if we required a VE to produce job statistics specific to the DOT-coded occupations a claimant can perform, it is unlikely that the Commissioner would *ever* succeed in satisfying her burden. This cannot be the result the regulations intend. Indeed, that the data [the claimant] requests does not exist 'is a sign that [the claimant] expects too much,' and like the Seventh Circuit, we decline to 'impose impossible burdens on the VE.'") (quoting *Guiton v. Colvin*, 546 F. App'x 137, 142-43 (4th Cir. 2013)).

For the above reasons, Plaintiff's challenges to the ALJ's findings at step 5 of his sequential evaluation lack merit.

**IT IS THEREFORE ORDERED THAT**:

1. The Commissioner's non-disability finding is affirmed; and
2. The case is terminated on the Court's docket.

September 21, 2017                                *s/Sharon L. Ovington*
                                                               Sharon L. Ovington
                                                               United States Magistrate Judge